# DECLARATION OF JEFFREY MARTIN

The undersigned, Jeffrey Martin, declares as follows:

1. My name is Jeffrey O'Neal Martin. I hold a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago.
2. I am employed as a consultant on statistical issues, a consultant on actuarial issues, and as a consultant to political campaigns. I have been qualified as an expert on statistical issues in Federal Courts and State Courts.
3. Since 1997, I have been involved in cases involving challenges to the jury lists in Federal and State Courts. I have worked on over seventy federal cases in over twenty-five federal districts.
4. I have been asked by counsel for Ricky Fackrell to analyze the jury list used at trial.

## SUMMARY OF FINDINGS

5. The questionnaires for persons who were considered for the Ricky Fackrell trial over-represents White persons who are non-Hispanic or Latino. The over-representation is statistically significant.
6. The questionnaires for persons who were considered for the Ricky Fackrell trial under-represents Black or African-American persons. The under-representation is statistically significant.
7. The questionnaires for persons who were considered for the Ricky Fackrell trial under-represents Hispanic or Latino persons.
8. The questionnaires for persons who were considered for the Ricky Fackrell trial under-represent persons aged 18 to 39 years old. The under-representation is statistically significant.
9. The questionnaires for persons who were considered for the Ricky Fackrell trial over-represents persons aged 40 to 69 years old. The over-representation is statistically significant.
10. The average and median ages for persons who completed the questionnaires for consideration for the Ricky Fackrell trial are greater than the average and median ages for the population in the Beaumont Division.

## DATA

11. The data supplied consisted of 305 questionnaires from the 317 persons considered for the trial of Ricky Fackrell. My understanding is that the 12 questionnaires not in the data reflect persons excused from jury service.

12. The questionnaires were completed in 2018.
13. The questionnaires included a question about each person's race and age.
14. 289 of the 305 persons provided a race. Of the 289 persons who provided a race, 231 (79.93%) identified themselves as White and non-Hispanic or Latino persons and 49 persons (16.96%) identified themselves as Black or African-American persons. 20 (6.56%) of the 305 persons identified themselves as Hispanic or Latino persons.
15. The ages of the 305 persons range from 19 years old to 72 years old.

## JURY ELIGIBLE POPULATION OF THE BEAUMONT DIVISION OF THE EASTERN DISTRICT OF TEXAS

16. The jury eligible population is defined as the population that is aged 18 years and older who are citizens of the United States. While there are other requirements to serve as a juror besides age and citizenship, this definition is standard for the analysis of jury lists and is the basis for census numbers on the Administrative Office of the U.S. Courts' Form AO-12 ("Report on the Operation of the Jury Selection Plan"). Form AO-12 is used by Courts and Clerks to assess the representativeness of their jury lists.
17. The most contemporary jury eligible population when the questionnaires were completed is the United States Census Bureau jury eligible population from the American Community Survey 5 Year Average numbers for the year 2018.
18. Using the 2018 American Community Survey 5 Year Average numbers, the jury eligible population for the Beaumont Division of the Eastern District of Texas is 65.46% White persons who are non-Hispanic or Latino and 22.66% Black or African-American persons. Hispanic or Latino persons, of any race, are 9.44% of the jury eligible population.
19. The Black or African-American percentages of the jury eligible population are likely understated. The United States Census Bureau has investigated the persons missed or under-counted in the 2020 decennial census (the Post-Enumeration Survey). The decennial censuses are a source of information for the American Community Survey.
20. Among the Census Bureau's nationwide findings were that Black or African-American persons alone or in combination were under-counted by 3.30% (statistically significant), Hispanic or Latino persons were under-counted by 4.99% (statistically significant), and that non-Hispanic White persons were over-counted by 1.64% (statistically significant).
21. This analysis will make no adjustment for the Post-Enumeration Survey which would increase the statistics of under-representation of Black or African-American persons or Hispanic or Latino persons.

## STATISTICAL ANALYSIS OF THE RACIAL DEMOGRAPHICS OF THE QUESTIONNAIRES

22. There are several standard statistical analyses used to analyze the under-representation of a distinctive group. The most common and easiest to calculate are Absolute Disparity and Comparative Disparity. From a scientific perspective, the number of Standard

Deviations from Expected shows whether the under-representation of a group is systematic or merely the result of "luck of the draw."

ABSOLUTE DISPARITY IN THE RACIAL DEMOGRAPHICS OF THE QUESTIONNAIRES

23. Absolute Disparity, which is the difference between the percent representation of a group in the population and the percent representation of the same group in the jury list, has the benefit of being very easy to calculate. Once Absolute Disparity is calculated, then there is a judgment of whether the Absolute Disparity is great enough to reflect a non-representative jury list. There is no scientifically determined threshold to reflect a non-representative jury list, only that more Absolute Disparity is worse than less. 10% Absolute Disparity has been put forth in some Courts as a threshold Absolute Disparity reflecting a non-representative jury list. An Absolute Disparity threshold of 10% is a much more demanding threshold for smaller groups than for larger groups. In the Beaumont Division, a 10% Absolute Disparity threshold would allow the complete exclusion of all Hispanic or Latino persons (9.44% of the jury eligible population) to be acceptable.

24. Using the group completing the questionnaire, the Absolute Disparity for White persons who are non-Hispanic or Latino is 14.47% over-representation (79.93% minus 65.46%).

25. Using the group completing the questionnaire, the Absolute Disparity for Black or African-American persons is 5.71% under-representation (22.66% minus 16.96%).

26. Using the group completing the questionnaire, the Absolute Disparity for Hispanic or Latino persons is 2.89% under-representation (9.44% minus 6.56%).

COMPARATIVE DISPARITY IN THE RACIAL DEMOGRAPHICS OF THE QUESTIONNAIRES

27. In response to the shortcomings of Absolute Disparity, Comparative Disparity has been used to analyze jury lists. Comparative Disparity (also known as Relative Disparity), or the rate at which a group is under-represented or over-represented, treats smaller groups in the same way that it treats larger groups. Like Absolute Disparity, there is no scientifically determined threshold of non-representativeness except that more Comparative Disparity is worse than less.

28. Note that, mathematically, since the population percentage of a cognizable group can never be greater than 100% or 1.00, Comparative Disparity which is divided by something less than or equal to 1.00, will always be greater than Absolute Disparity.

29. Using the group completing the questionnaire, the Comparative Disparity for White persons who are White persons who are non-Hispanic or Latino is 22.10% over-representation (14.47% divided by 65.46%).

30. Using the group completing the questionnaire, the Comparative Disparity for Black or African-American persons is 25.19% under-representation (5.71% divided by 22.66%).

That is, over a quarter of the Black or African-American persons expected in the group are missing.

31. Using the group completing the questionnaire, the Comparative Disparity for Hispanic or Latino persons is 30.56% under-representation (2.89% divided by 9.44%). That is, between a quarter and a third of Hispanic or Latino persons expected in the group are missing.

## STANDARD DEVIATIONS FROM EXPECTED IN THE RACIAL DEMOGRAPHICS OF THE QUESTIONNAIRES

32. Standard Deviation analysis is a widely accepted and fundamental tool used by statisticians to analyze data. Standard Deviation analysis allows statisticians to scientifically determine if the over-representation or under-representation of a distinctive group is statistically significant or not. That is, in any group drawn from the population such as a jury list, there are random factors that mean that the demographics of the jury list drawn from the population will not match the population demographics exactly because of "luck of the draw." However, standard deviations allow statisticians to scientifically determine whether the demographics of the jury list diverge substantially enough from the population demographics that the difference is not the product of chance but is systematic. Statisticians use a standard of 2 or 3 standard deviations to determine statistical significance. If there is no systematic under or over-representation of a distinctive group, the divergence of demographics should exceed 2 standard deviations only approximately 5% of the time while the divergence of demographics should exceed 3 standard deviations only approximately 0.5% of the time. In the same way that the decrease in probability from 2 standard deviations to 3 standard deviations from expected is much greater than 1.5 times (or 3/2 times), higher standard deviations from expected exponentially reduce the probability. The probability of more than 5 standard deviations from expected is practically 0.00%.

33. Using the group completing the questionnaire, the percentage of White persons who are non-Hispanic or Latino in the group differs from the percentage of White persons who are non-Hispanic or Latino in the jury eligible population by more than 5 standard deviations too high. White persons who are non-Hispanic or Latino are statistically significantly over-represented in the group completing the questionnaire. In other words, the over-representation of White persons who are non-Hispanic or Latino completing the questionnaires is not the result of random factors, chance, or luck, but is the result of a systematic process that over-represents White persons who are non-Hispanic or Latino.

34. Using the group completing the questionnaire, the percentage of Black or African-American persons in the group differs from the percentage of Black or African-American persons in the jury eligible population by more than 2 standard deviations too low. Black or African-American persons are statistically significantly under-represented in the

group completing the questionnaire. In other words, the under-representation of Black or African-American persons completing the questionnaires is not the result of random factors, chance, or luck, but is the result of a systematic process that under-represents Black or African-American persons.

35. Using the group completing the questionnaire, the percentage of Hispanic or Latino persons in the group differs from the percentage of Hispanic or Latino persons in the jury eligible population by 1.72 standard deviations too low. Even given the smallness of the group of Hispanic or Latino persons the analysis approaches statistical significance. If the sample (the group of questionnaires) was larger and the Absolute and Comparative Disparities shown in this group were similar, the result would be statistically significant.

AGE ANALYSIS OF THE QUESTIONNAIRES

36. Persons who are age 70 and over can, but are not required to, be excused from jury service as described in the Jury Plan Section 7c(1). The group of questionnaires included 1 person who was over the age of 70 years. Therefore, to compare the population of the Beaumont Division of the Eastern District of Texas to the questionnaires, only the ages 18 through 69 years old were considered for both the census numbers and the questionnaires.

37. The average age of persons completing the questionnaires is 49.91 years.

38. The average age of the population in the Beaumont Division in 2018 is approximately 42.69 years.

39. The median age (that age where half are younger and half are older) of persons completing the questionnaires is 52 years.

40. The median age (that age where half are younger and half are older) of persons in the Beaumont Division in 2018 is within the age group of 40 years to 44 years.

41. The questionnaires include 70 persons (23.03%) aged 18 to 39 years old and 234 persons (76.97%) aged 40 to 69 years old.

42. The population in the Beaumont Division in 2018 aged 18 to 39 years old is 153,956 persons (44.41%) and the population aged 40 to 69 years old is 192,706 persons (55.59%).

43. Persons aged 18 to 39 years old are under-represented with an Absolute Disparity of 21.38% (44.41% minus 23.03%), a Comparative Disparity of 48.15% (21.38% divided by 44.41%), and are over 7 standard deviations too low. The under-representation of persons aged 18 to 39 years old in the group of persons completing the questionnaire is statistically significant.

44. Persons aged 40 to 69 years old are over-represented with an Absolute Disparity of 21.38% (76.97% minus 55.59%), a Comparative Disparity of 38.47% (21.38% divided by 55.59%), and are over 7 standard deviations too high. The over-representation of

persons aged 40 to 69 years old in the group of persons completing the questionnaire is statistically significant.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 14th day of September 2023

Jeffrey Martin